Another argument in our next case, Virtual Drone Services v. Ritter, Mr. Gedge. Thank you, Judge Agee, and may it please the Court. This case presents a First Amendment challenge to North Carolina's surveying licensure law, as applied to aerial mapping and modeling. The surveying board, of course, sent a letter to Mr. Jones and his company telling them that it was a crime if they were to communicate certain photographs containing locational information. The district court recognized correctly that the law, as applied to Mr. Jones, restricted his speech. But even so, the district court upheld the law and did so by developing an intermediate scrutiny standard that breaks with nearly a decade of this Court's intermediate scrutiny precedent. And that, I think, is the easiest way to resolve this appeal. How is this case any different than the regulation of a lawyer or a doctor counted? So in the abstract, Judge Agee, I would say it's not different in that the regulation of a lawyer, a doctor, an accountant, or a surveyor can have valid applications that are triggered by non-speech conduct. The teaching, I think, of cases like Holder, like this Court's PETA case from last year, is that in evaluating an as-applied First Amendment challenge, we don't look at the law in the abstract and ask whether it can be triggered by non-speech conduct. Rather, and as Chief Judge Myers said in the Nutt case last month, rather we look at how the law is triggered as applied to the particular plaintiff. And here, I don't understand there to be any dispute that as applied to Mr. Jones, the surveying law is triggered by the fact, not by any non-communicative conduct, but by the fact that he is communicating photographs that contain certain types of information. I don't understand the Board to dispute that. Well, I think the Board would say that to be the devil's advocate, he can communicate whatever he wants. He just needs a license. So how is this different from a lawyer? We have lots of cases all across the country that say you've got to have a license. We're not going to tell you what to tell your client. Just like this Board's not going to tell your client what he's to tell his clients. But he's got to have a license. Yeah, so I think the same kind of traditional speech conduct analysis applies to lawyer licensing as it applies here. And it's certainly true that on their face, lawyer licensing laws do not violate the First Amendment, just as on its face, North Carolina's surveying licensing law doesn't violate the First Amendment. But when you have a licensing law that in a particular case is triggered purely by communicating a type of information that triggers that licensure requirement purely because of the information communicated. What is the information communicated? So here, Judge Thacker, the information is basic locational information measurement data within the photographs. And so that can come in a couple of ways. It can be metadata, for example, if the images are being conveyed electronically. It can be something as simple as a scale bar. So as we point out in our brief, for example, you have two images side-by-side. One doesn't have a scale bar, one does. One is a crime, and one isn't. But to return, Judge Agee, I think to perhaps your more fundamental question. What's the difference between aerial mapping services and land surveying? So as a matter of North Carolina state law, Judge Thacker, there is no dispute that the law is written broadly enough that it covers all of it. The question under the traditional speech conduct analysis is whether, as applied to these particular plaintiffs, what's triggering that definition of land surveying, what's triggering all those restrictions is some kind of noncommunicative conduct. For example, stamping a plan, which gives the survey legal efficacy. Or by contrast, whether what is triggering the law, as applied to the particular plaintiff, is purely communicating photographs that have certain kinds of information in them. And I don't understand either the district court or the board to contest that fundamental proposition. If you look, for example, at page 18 of the board's brief, if you look at JA, I think it's 982, the district court's opinion, they accept that as applied to Mr. Jones, what's triggering this licensure restriction is the fact that his photographs have certain kinds of information and he's sharing them with other people. Their proposition, I think, is that the ordinary speech conduct analysis that would say that a law that is triggered by a particular kind of information is content-based, doesn't apply in the specific context of licensure laws. And that, I think, is fundamentally at odds with the Supreme Court's teaching in the 2018 NIFLA case, for example, where the fundamental teaching of the Supreme Court and NIFLA is that these same First Amendment rules that apply to laws in general apply with equal force to licensing laws. Because, of course, they have to. Otherwise, as the Court acknowledged in NIFLA... What the Supreme Court is often wont to do, it drops this language in there about, well, we're going to give a more differential review, which, of course, they let us try to figure out for five, six, seven years until they take another case. But that does seem to put it into a different category than your traditional intermediate scrutiny case. Well, so I would disagree, Judge Agee, and I think the clearest data point on that is this Court's Billups decision, which likewise involved a licensure law, was from 2020, and where this Court basically said that the lowest level of intermediate scrutiny that's even on the table here is the traditional Reynolds, McCullen, and now PETA standard. Basically, intermediate scrutiny is intermediate scrutiny. And whether we're saying conveying these kinds of photographs is completely off-limits to everyone, or whether we're saying you have to spend nine years to be eligible and take three tests and pay a bunch of money before we'll let you convey these kinds of images containing this kind of content... Well, they do that to doctors, lawyers, engineers, accountants, hairdressers, all sorts of folks like that, before they can communicate their craft to a client. And it seems like your argument is, well, we want to communicate certain types of map-type information, meets and bounds, elevations, latitude, longitude, all that sort of stuff, and we can do that whenever we want to. But anybody else who does a traditional survey conveying the same information, well, they've got to get a license, but we don't have to. Well, so I don't think that's quite right, Judge Agee. To start, we're not saying we can do that whenever we want to. We're saying that, at a minimum, the Board has to satisfy its burden under the customary intermediate scrutiny standard, and the Board had three years in this case to try to carry its burden under that standard, and they've defaulted on it. So for that reason, I think even applying the lower level of intermediate scrutiny that the Board, I think, comes close to conceding is appropriate here, this is a relatively easy case. I do want to, though, kind of push that. It is if we walk into the lane of the intermediate scrutiny as though it's in the general terms of it, but you're relying upon Reynolds and Willis. But the evidentiary requirements in those cases dealt with this narrow tailoring, which the capital associates case did not. It didn't apply to this conduct-based type of regulation. So why is that not different? Why shouldn't we do the same thing here? Because capital associates seems to go into a common sense to determine whether it was reasonable. So why shouldn't we do that here? Yeah, so, Judge Winn, I read the intermediate scrutiny standard that the Court was applying in capital-associated industries to be the traditional intermediate scrutiny standard that we see in Reynolds and McCullen and NIFLA and more recently in PETA. And I think the clearest data point on that is that in saying we're applying intermediate scrutiny here, the panel in capital-associated industries cited the Supreme Court's decision in NIFLA's articulation of intermediate scrutiny. And if you look at the Board's brief here at page 55, I understand that... But let's agree, these capital associates, you have to agree, they specifically said narrow tailoring wasn't required. Yes, so I do want to address that, Judge Winn, because it's certainly true that the phrase narrow tailoring I think may engender some confusion here, right? You see it in the traditional articulation of strict scrutiny. You see it even in Ward v. Rock v. Racism in traditional articulations of intermediate scrutiny. So, you know, this may not be satisfying, but I think that term has two kind of different meanings in the strict scrutiny context and in the intermediate scrutiny context. If you look at McCullen, for example, they're using the phrase narrow tailoring there as well, and that's undisputedly kind of the touchstone intermediate scrutiny case under current law. So, you know, our position isn't that if the court were to apply traditional intermediate scrutiny, it has to apply strict scrutiny's narrow tailoring requirement. Our submission, I think, is a simpler one, namely that if this court applies traditional intermediate scrutiny, it should apply the traditional intermediate scrutiny of Reynolds and Billups and PETA and McCullen and NIFLA. And that doesn't necessarily require the least restrictive means, which is the touchstone of strict scrutiny, but it does require, for example, that the government come in and present evidence that it considered or seriously considered or tried less restrictive, readily available alternatives. And here, the board has... You're right that that's part of that test, though I'm not sure that articulation is adopted by any other circuit. Maybe, but we didn't find it. And it seems like the difficulty there is this, and this is just part of the Supreme Court not defining what more differential review is, that you take the example of a physician. So the decision of the Board of Medicine, you know, are you required to get a license? No, we have to produce evidence that we've looked at other alternatives. And so that evidence is, well, we let the guy off the street perform a couple of operations, and eventually he killed somebody. So we've determined now that that's the least restrictive alternative. So it seems like to me that that's a real gap in the argument you make when it comes to the regulation of professional conduct. So I guess a couple of points on that, Judge Agee. First, I'll point out that there are, in fact, that might not be identical to this Court's Reynolds and Pita articulation of intermediate scrutiny, but that's certainly set the intermediate scrutiny bar higher than anything the Board has even suggested it can carry here. I'll give you one example from the Tenth Circuit. It's called Brewer v. City of Albuquerque. Not the identical articulation, but far more than what we have on the record here. But to address perhaps... Is that in your brief? It's not, Your Honor. And what's the name of it again? Sure, it's a Brewer v. City of Albuquerque. It's 18F4-1205 from the Tenth Circuit. And just the poll quote is that, quote, the government's less restrictive means analysis must involve at least a serious consideration of less restrictive means. And I'm not saying it's identical to Reynolds and Pita. Is that a professional licensing case? I don't believe it was, Your Honor. But I do want to touch on what I think is your more fundamental concern, which is the idea that our understanding of the speech conduct line or the intermediate scrutiny analysis somehow hampers the ability of licensing agencies to regulate non-speech conduct. And so in your example, for example, someone performing a medical operation, that is non-speech conduct. You're not expressing any information by cutting somebody open. And so if that person brings an as-applied challenge, then I think that's a pretty easy case. That's not a First Amendment case because you don't have a First Amendment right to chop people up. Change that hypothetical to the would-be doctor who examines an individual and says, I'm pretty sure you don't have cancer. And of course they do. Now that's speech. So that certainly is speech, Your Honor. And I do think the same speech conduct line applies to that kind of situation. And we know that, I think, because across the nation, you do see kind of narrow as-applied First Amendment challenges being pursued successfully even against, for example, lawyer licensure. So we point to the Upsolve case, for example, out of the SDNY, which is an as-applied challenge to lawyer licensure, not on its face, but as applied to a narrow access to justice program that simply wants to offer advice about debt collection issues. And Judge Crotty, I believe it was, on the SDNY, said, sure, we're not calling into question the entire kind of ballpark of lawyer licensure, but when, as applied to the particular thing the plaintiff wants to do, what's triggering the law is the simple act of communicating advice, then the teaching of NIFLA, of Holder v. Humanitarian Law Project, in fact, of this case's Billups decision, is that at least that is content-based and that the standard rules of First Amendment scrutiny apply. And Judge Wynn, I don't understand that to be inconsistent with capital-associated industries. Even under the intermediate scrutiny standard articulated in that, I think the Board's defense on intermediate scrutiny really has to rest on the assumption that the panel in capital-associated industries was silently marking out a new and uniquely deferential level of intermediate scrutiny just for licensure laws, except for licensure laws that involve tour guides. And I think that's a pretty radical misreading of capital-associated industries. What about Casey? The Supreme Court said that was conduct. Were they wrong? The way the Supreme Court in NIFLA articulated Casey was that Casey is a paradigmatic example of a generally applicable licensing law that is triggered in that particular instance by non-speech conduct that, of course, has an incidental effect on speech. So there, for example, the trigger of the law in Casey, the informed consent law, was the act of performing a medical procedure, an abortion, which is non-speech conduct. That's the trigger. Of course, it has an incidental effect on speech because the physician can't engage in that non-speech conduct until they get informed consent. But that, I think, is a paradigmatic example of a law restricting non-speech conduct that incidentally affects speech. I think if we apply that same standard to this case, we fall on the diametrically opposite end of the spectrum because here, as applied to Mr. Jones, there's no non-speech, non-communicative conduct on his part that's triggering the law. He doesn't want to stamp plans and give them legal efficacy. He doesn't want to submit surveys to the local register of deeds and give them legal efficacy. All he wants to do is take photographs and provide those photographs to willing consumers. And the position of the board is that it is a crime for him to do that, that he can't do that unless he gets a license, which will take him 10 years to get, because of the content at a granular level, because of the content in those photographs, because of the metadata, because of whether there's a scale bar or not a scale bar. And I think under the fundamental teaching of the speech conduct line, which again, the court in NIFLA says that applies across the board to licensing laws and non-licensing laws alike, that's a content-based line. And Judge Agee, back to your point, if I may, on the idea that maybe we should be drawing some kind of distinction between laws that outright ban speech versus laws that say you have to spend 10 years getting a license before we'll let you engage in this speech. I think there's a couple of responses to that. First is the standard line that we're subject to the same level of scrutiny as bans on speech. It's a matter of degree, but it doesn't affect whether we're, you know, in the speech box or the content box, sorry, the speech box or the conduct box. That's in the Sorrell case. That's in the Playboy case from the late 1990s. But I think the other instructive data point on that concern is that in NIFLA itself, the Supreme Court abrogated not just circuit court decisions that were licensing laws restricting what license holders could say. The Supreme Court also abrogated circuit court decisions that involve licensing laws that acted as here, that acted as a gatekeeper, saying you can't engage in this kind of speech unless you first get a license. That's this Court's Moore-King v. Chesterfield case, the fortune teller licensing case, which the Supreme Court said in NIFLA is wrong, is inconsistent with traditional speech conduct analyses, and is abrogated. And I think posture-wise, that Moore-King case is similar to this one in that it's not saying, well, they tossed a professional speech exemption and in its place substituted this amorphous less-deferential review. So what do you think less-deferential review is? Well, so I disagree, Judge Agee, that they substituted an amorphous less-deferential review. Rather, the fundamental teaching of NIFLA, and it says it explicitly, the Fifth Circuit and Visalign interpret it this way explicitly. The teaching of a licensure law, whether you're dealing with whatever we might characterize as professional speech, we're not saying do something amorphous. We're saying apply the traditional First Amendment rules that apply everywhere else. I think the Court uses the phrase ordinary First Amendment principles. And here, I think the Board's position kind of on both fronts of this case require the Federal Courts to apply something other than ordinary First Amendment principles to this law. I thought in Visalign the Court of Appeals there just said, look, you didn't do a NIFLA analysis, so now we're going to send it back and you do it. So I don't think that's quite right, Judge Agee, because what the Fifth Circuit said in Visalign is that the District Court effectively did almost exactly what the District Court did here. If you put those two District Court decisions side-by-side, they look really similar. And in both of them, what the District Court is saying, sure, there's typically an ordinary speech conduct analysis where we look at how the law is triggered as applied to a specific plaintiff, but if we're dealing with a licensing law, it's enough to say that it's a generally applicable licensing law, and we basically say that that gets some kind of lower First Amendment scrutiny. And the teaching of Visalign, I think, consistent with NIFLA, is that's not how we do it. We apply the traditional speech conduct taxonomy, I think that's a quote directly from Visalign, and applying that traditional speech conduct taxonomy here, we look to cases like this Court's PETA case, we look to cases like Holder v. Humanitarian Law Project, we can go back to Cohen v. California, and we can say, sure, it's fine that this law is facially valid, it's fine that oftentimes it is triggered by non-speech conduct, but when, as here, it's triggered by whether your photographs have certain kinds of content in them or not, then that's a content-based restriction on speech, and it's subject to strict scrutiny. The final thing I'll say, perhaps, is to end where I started, which is that I do think the easier approach here is to follow in the path of Billups and say, we don't necessarily need to pass on the strict scrutiny, intermediate scrutiny question here, because even under the intermediate scrutiny standard that this Court has described as non-negotiable, that it applied in Billups and Reynolds and PETA, that the Board has utterly defaulted on its burden thereto. Thank you. Thank you. Mr. Hanno. Good morning. May it please the Court, Mr. Jones is arguing here today that all he wants to do is take photographs and sell those photographs. Well, that's not so. He's certainly free to take photographs, sell photographs, take videos, sell video. This case, though, is about the conduct, the work, that he undertakes to create measurable maps and 3-D models. We know from the record that a 3-D model is, in fact, a survey. It doesn't contain metadata. It's self-contained. And he wants to go through the work process, right? He wants to sit down in front of a computer, wants to sketch out the property diagram. He wants to then create a data plan where a certain elevation, certain number of pictures that need to be taken. Then he goes to the site. He flies his drone. They take the pictures. He takes the data. He puts it back into the computer. He generates a... Which sounds like surveying, which is why I asked if I was in council, what's the difference between aerial mapping services and land surveying? There is no difference. And the act, when you look at the act, it talks about... When it talks about the definition of land surveying, it talks about the providing professional services. And my friend says, we don't dispute that there's... that there's speech involved. Well, and we're not really arguing. We have a hard time identifying conduct. Not so the conduct itself is the process of going through preparing the maps and the violation occurs before he ever communicates the map or sends the map to the client who's already engaged. And so when you look at this case, capital controls. So here he's using a drone to do this. Help me out here. Why does this sound a lot like what I see with a Google map? Isn't that just what they do? You might use a satellite or whatever, but you can get a pretty strong indication of what a land boundary is and all with a Google map. What's the difference here with that? Yes, Your Honor. So the Google maps is a tool. A drone is a tool. A camera is a tool. Think of practicing law. Lexis is a tool. There's nothing wrong with using those tools, including the software program that Mr. Jones has, but those are tools that Mr. Jones unfortunately is not licensed, but that a surveyor would use to generate a 3D model, a survey. A lawyer would use to do all the analysis to generate a contract. Maybe do some research on if I'm going to prepare a non-compete contract, I need to know what the law says, what pitfalls I need to avoid. I need to think through choice of law, forum, and then I'm going to prepare that contract. And my friend, when he tries to distinguish capital, wants to only focus on the contract that Capital Associated wanted to do, ignores the call center portion, and then concedes the preparation of the contract, of course, is conduct, which is analogous to creating a map, and in fact goes so far as to say the contract itself is non-speech, which also is analogous to the map. I'm not trying to oversimplify because I'm just wondering, when you do have a Google Map, they put out maps on this. Are they violating the law when Google Maps put out a map, or is it just a tool? It's a tool. They're not violating the law. If you own a piece of property, you're free to go on to Google Maps and use that tool however you like. So I got the tool part, but what happens when you put it out? That's what I'm getting at. All of it is tool, and your problem is the putting out this data, and I'm not making this a Google Map case. I'm just trying to make it, at least in my mind, understand the difference between the two, because it looks like to me you can do everything with a Google Map that basically they're doing here, but put it out. I mean, there are probably a few more details on it that you're getting from this, but you will be able to get everything that's here. So, again, there's a client who's hiring somebody to prepare a survey or to prepare a measurable map, and the record indicates there are so many uses that we can't even identify them all, but the record has identified a number of uses for that information. The Google Map information is, again, that's a tool, but you're going to hire somebody to prepare a survey to provide the locational data, provide a 3D model, a survey, and it's the work. So when appellant advertised quote, with this information construction companies can monitor the elevation changes, follow metrics for gravel, dirt, and rock, and watch the changes in progression of the site as it forms over time, is that part of the problem, the difference between what they're doing in Google Maps? Yes. They're advertising a service? Go ahead. There's the advertising saying, hey, we can do these, prepare these aerial maps for you, surveys, and we can do the work because we have the tools, and we'll go to the site, we'll do the site visit, and we'll create this work product with what Mr. Jones calls a client deliverable, and that's that conduct is the practice of surveying, and the not only does capital in this case control, but capital's in line with other circuits, the second circuit, the ninth circuit, the eleventh circuit, and the district court correctly followed the analysis in capital, and they did so for a number of reasons, right, context, really important, the regulation of professional conduct, long history and tradition, there's more than 100 years of Supreme Court precedent, and the that you have broad power to regulate these professions. Why? Because the public needs to know that there are minimum standards before you can become a doctor, lawyer, land surveyor, engineer. In Orlick, the Supreme Court said that states bear a special responsibility for maintaining standards. In Casey, they talked about the broad latitude. What if they did it for free? It's still the practice, Your Honor. It's still, even if it's pro bono, right, it's still practicing law, and somebody is relying on your degree of expertise, and if you make an error, then that's going to harm the public. And obviously in this case, we're talking about interest, public interest of minimum level of competency, and again, it's the floor. We're talking about protecting property, and we're talking about accountability. If he gets a license, he can do all these things that he wants to do. Yes, Your Honor. When the Supreme Court in Nifflin said that we're going to have this more deferential review, and the conduct that only incidentally affects speech cases, what do you think they meant there? Well, I think what was important in Nifflin was they were saying that to the lower courts, professional speech is not categorically exempt from a First Amendment analysis. You do have to go through the analysis, but you do get more deferential review, because again, you have cases going all the way back to Dent in 1889, recognizing the state's broad power to regulate in this area, and the importance of it. I think the deferential review was it's important to differentiate between professionals and non-professionals when the court does this review. My friend wants to talk about the Billups case, the Tour Guide case in South Carolina. If I were in his shoes, I'd want to talk about it too, but that case and those line of cases do not apply here. In the Billups case, and there are three really important reasons, right? Billups, Reynolds, McCullen. And in those three cases, they did not involve regulation of professional conduct. There was not a hundred years of Supreme Court precedent telling states you can regulate in this area. And in fact, go back to McCullen, that was a Massachusetts case, and the Supreme Court said this was the only state in the country regulating, putting a buffer zone around abortion providers, abortion clinics. Do I understand you saying that they could, the other side could, hire a land surveyor certified and do everything they're doing? Whereas he can just go out and hire someone in his company who then will sign off on these things and you're okay with it? If you could repeat your question, I'm not sure I'm following. In other words, he could either go get a license himself, or he could hire someone to be in his company and that person would be the one responsible in terms of signing off on it. That's okay? Absolutely. That's how people get trained in land surveying. They work under a licensed surveyor. They can do the field work and prepare the data and then have the licensed surveyor create the map and sign off on the map. That's right. There's nothing wrong with working, or a licensed surveyor may hire Mr. Jones to fly his drone and collect the data, but it's the licensed land surveyor who's making sure it was done appropriately, it was, we're using ground control points. That was one thing that came out in this case. Mr. Jones didn't know what ground control points are. I don't want to take your feel on this, but at least I'm trying to differentiate this from law practice, from medicine, I mean, all the licensing things that come with it. I was on a dental case some years ago, and I don't think the dentists have forgiven me yet for that one, but I was on the concurrence for something the Supreme Court did, but when you look at something like this, I mean, we cannot divorce ourselves where we are. What you were telling me is that a surveyor who they would hire someone would happen, there's this thing called AI, which is probably better than the surveyor there, and if you put AI with this thing, it's probably giving you a surveyor better than anybody else out there, probably. I'm just saying ultimately. Are we headed there? And maybe that's the next case for us to look at down the road, but we don't have to go there today, but it just concerns me with the technology that's out there and what we're dealing with, how to differentiate this particular case, you know, because it's in the context of it being a speech case, you know, from other licensing cases. AI is concerning, right, in the practice of law. There are briefs that are using AI that are mis-citing cases or citing cases. We won't go there today. Well, it's important, though, because a licensed practitioner who has a minimum level of competence is not going to rely completely on AI. They're going to go read the statute. In this context, you can't just rely on this drone deploy software and push a button. You've got to know what you're doing in order to use that tool effectively. That's the key. You need to have a minimum level of competency through education, experience, and training. And the Supreme Court has said for more than 100 years that those states have broad power. And I just want to go back to those line of cases and talk about the three things that differentiate them. First is in those cases, obviously, they didn't involve the context of professional regulation. Second, there was no consensus. But Billups did. No, Your Honor. It dealt with a licensing case, not regulation of profession. Much different. And, in fact, in Billups, see Billups couldn't rely on it. Well, I thought that the tour guides had to have meet certain requirements as a preliminary to get a license just like a lawyer or a doctor would. No, in Billups, they had to pass the test. And the court said, Well, you're the only, but it's not a profession. It wasn't a regulation of profession. And the court didn't like the fact that Mr. Billups had to pass the test to go on the public streets and speak. And the court indicated in that case that was, in fact, the only jurisdiction I believe where they required a test. And in those cases, the courts talked about, and I'm talking about Billups, Reynolds, McCullen, the courts talked about that these were unique, novel, exceptional, unprecedented, because there was no consensus. In our case, North Carolina follows the consensus of the approach on how to regulate land surveying. And that's an important consideration. But in those three cases, the last point I'll make is that all three cases involved a vital First Amendment interest. And I'm talking about Billups, Reynolds, McCullen. Going on to the traditional public forum speaking. In McCullen, the Supreme Court indicated you have, states are limited in their ability to regulate in that area. And I compare that and contrast that with the broad powers that states have to regulate professions, which is much different than Mr. Billups. So if you go back and you look at the standard here, and I think Judge Wynn hit on it, which was narrow tailoring in capital was not required in capital. And the narrow tailoring was what was focused on in Reynolds, Billups, McCullen. Why? The court wanted more. There was concerns in those cases the court wanted more. In our case, and in capital, the court indicated a reasonable fit. And I also want to make sure I clarify that you know, my friend says that we defaulted, that we're not even trying to meet our burden. Not true. I believe we would meet our burden under intermediate scrutiny or strict scrutiny. But the intermediate scrutiny standard that applies is a reasonable fit as set forth in capital. And as we know from this court's precedent, reasonable fit may be established in any number of ways. So you can look at common sense. You can look at the intent of the act, the declaration. So in this case, the declaration of the act is in order to safeguard life, health, and property and to promote public welfare, the practice of both engineering and land surveying is hereby declared to be subject of regulation in the public interest. You can look to history. You can look at case law precedent. You can look at consensus. You can look at the expert testimony that we had in this case. You can look at, again, really boiling down to common sense. That the Supreme Court has indicated for, and goes all the way back to Hawker in the late 1800s, that the Supreme Court has recognized the power of the legislature to ensure competency. And we cited a Tennessee Supreme Court case that had provided judicial notice of much litigation when there are errors in survey. So I think that there's sufficient evidence in the record to support a reasonable fit in this case. And obviously, I skipped over the, is the law substantial or are the interests substantial? But even if you look at I think it was Goldfarb where they talked about the Supreme Court indicated that these kind of regulations of professional conduct are compelling. So they're, I think, the state would easily meet that burden. It just seems to me when you start dealing with this professional conduct, we're walking down a path that's leading somewhere when you start out, when you take a tour guide, the case with the tour guide, I mean, you say it's not a profession. And then you walk into where we are now dealing with professional conduct. Why wouldn't we just stick with the, I guess where the Supreme Court seems to be going, the speech versus conduct determination? Is it content-based, that sort of thing? And move in that direction and stay with that? And the question then is, is this speech or is it conduct? Right, I think, I do think that you have to make that determination. Is it just like in this law? Do we have to use the professional? Is that the narrowing of it? When we're dealing with whether it's a professional conduct, a professional relationship? Yes, I think, again, the context is very important. I'm not saying you don't do the speech conduct analysis, but when you do the speech conduct analysis, you have to understand the context of regulating a profession. And you have to understand that, you know, just in Visalign, in the other circuits, the Second Circuit, the Eleventh Circuit, and in Capital, it's important to determine first, is this just speech? Speech is speech? Which it's not, in our view. Is it conduct that incidentally burdens speech? Possibly. Or is it non-speech? Possibly. I mean, my friend argues that the case in Capital involving preparation of these contracts by a lawyer, that's non-speech. Well, it's a good argument. If that's non-speech, maybe the maps are non-speech. What did the Supreme Court do in NIFA? I mean, Judge Agee used a word that left us in an amorphous world. I think he's right. Because it seemed pretty clear when you were dealing with professional speech. Can I write that down? You can. You may get a chance. But it, I mean, but then it put us in, where did it take us? When it took us away from the professional speech basis to, because it rejected that, and then it went into this for want of a better term, amorphous world that we're now dealing with, the speech conduct world. It didn't reject professional speech. It rejected the categorical exemption of professional speech. It said professional speech and the regulation of professional speech may deserve more deference in some context. But it didn't reject it. It just said, no, you've got to go through a traditional First Amendment analysis. And NIFA, and the reason why I did that is because there's more than 100 years of case law talking about states. You do have broad powers to regulate in this area. You are on sound ground. And if you're in the consensus, that's important. So I see my time concluding and just to wrap up, I would say capital controls is work product, in this case, is conduct. The reasonable fit analysis is met by the state of North Carolina. And if you followed their argument, I think you'd be walking down a no limiting principle concern of undermining states ability to regulate in this field. We would ask that you affirm the judgment of the district court. Thank you for your time. Thank you, Mr. Hanna. Mr. Hanna, you have a bit of time in rebuttal. Thank you, Judge Agee. I'll pick up where my friend, Mr. Hanna, left off, which is urging this court to apply, quote, traditional First Amendment analysis. I agree with him wholeheartedly. I think our ground of disagreement is that at every turn, the board's path for affirmance here requires this court to depart from fundamental First Amendment principles at a bedrock level. Let's start with conduct. Mr. Hanna says that we're talking about non-speech conduct here. When asked to describe it, he talks about taking pictures and processing pictures and communicating pictures. We can break down any communicative act into constituent non-speech sounding components, but the fundamental teaching of the First Amendment is that's not how we engage in the First Amendment analysis. And that's precisely what Chief Judge Meyer said last month when he rejected that precise argument from the board in the Nutt case. He said, although forms of pure speech, such as writing and painting, can be reduced to their constituent acts and thus described as  to disconnect the end product from the act of creation. I think that's consistent, too, with the board's concessions at summary judgment. For example, they conceded that the triggering act here is not some non-speech work product, but rather the act of communicating. If you go, for example, to JA 49, we alleged in our Statement of Undisputed Facts that the board's current position is that plaintiffs can create aerial orthomosaic maps, but cannot give the maps to anyone if the maps contain location information, georeference data, or any other information that a recipient could use to make measurements on the maps. At the end of the day, the trigger here is speech. And to say the trigger here is something other than speech requires this court to mark out a new special rule applicable to licensing laws alone. That's precisely what the Supreme Court in NIFLA said the court cannot do. As the court in the Fifth Circuit in Visalign made clear, the court in NIFLA, quote, made clear that First Amendment scrutiny does not turn on whether censored speakers are professionals licensed or not. And yet the board's only ground for distinguishing billups, which is a binding precedent of this circuit, is to say that somehow tour guides who are licensed are not professionals, but people who want to take pictures and share pictures are. And that's precisely the amorphous line that the court in billups abrogated, including in abrogating this court's Moore-King case versus Chesterfield. If the court has no further questions, we would ask that the judgment below be reversed. Thank you all very much. We very much appreciate the argument of counsel. We're going to come down and say hello and move on to our next case.
judges: G. Steven Agee, James Andrew Wynn, Stephanie D. Thacker